

United States Courts
Southern District of Texas
F I L E D

SEP 11 2019

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § § v. § § FRANKLIN NWABUGWU, R.P.H, and § DEXTER LARD, § § Defendants. § | Criminal No. 19CR676 UNDER SEAL |

## INDICTMENT

The Grand Jury charges:

### GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse, the drug had a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

4. Pursuant to the CSA and its implementing regulations:

    a. Oxycodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(xiii). Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

    b. At all times relevant, and as of October 6, 2014, Hydrocodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(vi). Prior to October 6, 2014, Hydrocodone was classified as a Schedule III controlled substance. Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

    c. Carisoprodol, was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive. The FDA recommends carisoprodol only for acute treatment for two to three weeks at a time.

    d. Alprazolam was a benzodiazepine classified as a Schedule IV controlled substance. Alprazolam, sold under brand name Xanax, was used to treat anxiety and panic disorder and was addictive.

    e. Promethazine with Codeine was classified as a Schedule V controlled substance, often prescribed in liquid form to treat coughs and upper respiratory symptoms. Promethazine with Codeine, as with other opioids, was highly addictive.

5. It was well known that the combination of high-dose opioids, including oxycodone or hydrocodone and carisoprodol significantly increased the risk of patient intoxication and overdose. Moreover, prescribing oxycodone or hydrocodone and carisoprodol often created a significant risk of diversion because the two drugs, prescribed together, were often highly abused and sought for a non-legitimate medical purpose due to the increased "high" a user may experience from taking hydrocodone or oxycodone along with carisoprodol.

6. Accordingly, for a treating physician to prescribe the combination of high-dose opioids and carisoprodol for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7. The combination of hydrocodone, carisoprodol, and alprazolam was known as the "Houston Cocktail," or the "holy trinity," because of its high abuse potential and lack of therapeutic effect.

8. Medical practitioners, such as pharmacists, physicians, and nurse practitioners, who were authorized to prescribe, dispense, or distribute controlled substances by the jurisdiction in which they were licensed to practice, were authorized under the CSA to prescribe, or otherwise dispense or distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by a qualifying practitioner—including pharmacies, physicians, and nurse practitioners—the Drug Enforcement Administration ("DEA") assigned a unique registration number.

9. Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

10. Chapter 21 of the Code of Federal Regulations, Section 1306.06 governed the filling of prescriptions and provided: "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy, a registered central fill pharmacy, or registered institutional practitioner."

11. All prescriptions for controlled substances must be "dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a).

12. The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas Department of Public Safety ("DPS") up until September 1, 2016, and thereafter by the Texas State Board of Pharmacy ("TSBP"). Pharmacies were required to report to the PMP all controlled substances dispensed, including: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

13. TSBP Rule 291.29 related to the Professional Responsibility of Pharmacists, and instructed a pharmacist to make every reasonable effort to ensure that any prescription drug order has be issued for a "legitimate medical purpose by a practitioner in the course of medical practice."

4

14. TSBP Rule 291.29(c) provided reasons to suspect that a prescription may have been authorized in the absence of a valid patient–practitioner relationship or in violation of the practitioner's standard of practice, including:

    a. a disproportionate number of patients of the practitioner receive controlled substances;

    b. the manner in which the prescriptions are authorized by the practitioner or received by the pharmacy;

    c. the geographical distance between the practitioner and the patient or between the pharmacy and the patient;

    d. knowledge by the pharmacist that the patient has exhibited doctor-shopping or pharmacy-shopping tendencies.

15. TSBP Rule 291.29(f) identified "red flags" related to non-therapeutic dispensing of controlled substances.

## ENTITY AND DEFENDANTS

16. Golden USA Pharmacy, Inc., which did business as **Golden USA Pharmacy**, operated as an independent retail pharmacy located at 7400 Harwin Drive Suite 192, Houston, Texas 77036, as early as in or around March 2014. **Golden USA Pharmacy** was formed in or around 2011, in Lubbock, Texas, and moved to Houston, Texas, in or around March 2014. **Golden USA Pharmacy** became registered with the DEA, and has been licensed with the TSBP, since approximately February 2012. **Golden USA Pharmacy** was authorized to dispense Schedule II through V controlled substances.

17. **FRANKLIN NWABUGWU, R.P.H.** ("**NWABUGWU**"), a resident of Harris County, Texas, was the owner and Pharmacist in Charge ("PIC") at **Golden USA Pharmacy**.

5

**NWABUGWU** dispensed thousands of prescriptions for controlled substances from **Golden USA Pharmacy**, based on fraudulent and illegitimate prescriptions.

18. **DEXTER LARD** ("**LARD**"), a resident of Harris County, Texas, was a "crew leader" who coordinated with **NWABUGWU** at **Golden USA Pharmacy** to fill fraudulent and illegitimate prescriptions and divert controlled substances for profit. **LARD** had a preexisting relationship with **NWABUGWU** from **NWABUGWU's** previous involvement with other pharmacies in Houston.

19. Person 1 was **NWABUGWU's** spouse who worked at **Golden USA Pharmacy**.

20. Person 2 was a pharmacy-technician trainee employed by **NWABUGWU** at **Golden USA Pharmacy**.

### COUNT 1
**Conspiracy to Unlawfully Distribute and Dispense Controlled Substances**
**(21 U.S.C. § 846)**

21. All previous paragraphs of this Indictment are incorporated here.

22. From in or around October 2015 through in or around December 2018, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**FRANKLIN NWABUGWU, R.P.H** and
**DEXTER LARD**

knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, and with others known and unknown to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally distribute and dispense, and

to knowingly and intentionally possess with intent to distribute, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and other controlled substances, outside the usual course of professional practice and not for a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 846.

### Purpose of the Conspiracy

23. It was a purpose and object of the conspiracy for Defendants, and others known and unknown to the Grand Jury to unlawfully enrich themselves by, among other things: (a) distributing, dispensing, and diverting controlled substances outside the usual course of professional practice and not for a legitimate medical purpose; (b) generating large profits from distributing, dispensing, and diverting those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

### Manner and Means of the Conspiracy

The manner and means by which the Defendants sought to accomplish the purpose and object of the conspiracy included, among other things:

24. **NWABUGWU** obtained a Texas Pharmacy and Texas Pharmacist Licenses from the TSBP and a DEA Registration for **Golden USA Pharmacy**.

25. **NWABUGWU** managed and oversaw operations at **Golden USA Pharmacy**, along with Person 1 and Person 2.

26. "Crew leaders," including **LARD** regularly and knowingly obtained illegitimate and fraudulent prescriptions for controlled substances that were not written or authorized by a

7

physician. The prescriptions regularly listed fictitious patient names, addresses, diagnoses, and physician phone numbers.

27. "Crew leaders," including **LARD** regularly delivered illegitimate and fraudulent prescriptions to **Golden USA Pharmacy**.

28. **NWABUGWU** and **Person 1** communicated with "crew leaders," including **LARD**, about their orders.

29. **NWABUGWU** knowingly filled illegitimate and fraudulent prescriptions for Schedule II through V controlled substances from **Golden USA Pharmacy**, including oxycodone, hydrocodone, carisoprodol, alprazolam, and promethazine with codeine, among others, in exchange for cash from "crew leaders," including **LARD**. **NWABUGWU** often charged approximately $1,200 to fill just one oxycodone prescription, and over $500 to fill just one hydrocodone prescription, well over market value for legitimate prescriptions.

30. The prescriptions **NWABUGWU** filled at **Golden USA Pharmacy** were almost always for oxycodone 30mg, hydrocodone 10mg, and carisoprodol 350mg—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone. **NWABUGWU** ordered these high-strength controlled substances from multiple drug distributors.

31. **NWABUGWU's** management, operation, and dispensing at **Golden USA Pharmacy** exhibited many, if not all, of the pill-mill Red Flags warned against by TSBP.

32. Thousands of prescriptions were forged, stolen, written, and filled by Defendants and their co-conspirators, known and unknown to the grand jury, outside the course of professional practice and not for a legitimate medical purpose.

33. From in or around June 2016 through in or around October 2018, according to **Golden USA Pharmacy's** dispensing records, **NWABUGWU** filled more than 25,000 controlled substance prescriptions, dispensing approximately 2,400,000 controlled substance pills—including approximately 490,000 pills of oxycodone 30mg, more than 1,000,000 pills of hydrocodone 10mg, approximately 640,000 pills of carisoprodol 350mg, and approximately 290,000 pills of alprazolam 2 mg, often in combination.

All in violation of Title 21, United States Code, Section 846.

## COUNT 2
**Maintaining a Drug-Involved Premises and Aiding and Abetting
(21 U.S.C. § 856(a)(1) & 18 U.S.C. § 2))**

34. Paragraphs 1 through 20 and 24 through 33 of this Indictment are incorporated here.

35. From in or around October 2015 through in or around December 2018, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendant

**FRANKLIN NWABUGWU, R.P.H,**

aiding and abetting and aided and abetted by others, did unlawfully and knowingly use and maintain a place known as **Golden USA Pharmacy**, located at 7400 Harwin Drive Suite 192, Houston, Texas 77036, for the purpose of distributing Schedule II controlled substances, including oxycodone and hydrocodone, outside the usual course of professional practice and without a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 856(a)(1) & Title 18, United States Code, Section 2.

## COUNT 3
### Destruction of Evidence
### (18 U.S.C. § 1519 & 18 U.S.C. § 2)

36. Paragraphs 1 through 20 and 24 through 33 of this Indictment are incorporated here.

37. In or around October 2018, the exact date being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**FRANKLIN NWABUGWU, R.P.H and
DEXTER LARD**

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, including Person 2, did knowingly alter, destroy and mutilate records and documents, to wit: patient signature log books and other records and documents, with the intent to impede, obstruct, and influence the investigation and proper administration of the inspection and investigation of Golden USA Pharmacy, a matter that the defendant knew was within the jurisdiction of the Drug Enforcement Administration, a department and agency of the United States, in violation of Title 18, United States Code, Section 1519.

### NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853(a))

38. Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants, that upon conviction of an offense in violation of Title 21, United States Code, Sections 841, 846, or 856 the following is subject to forfeiture:

    a. all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

    b. all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

## Money Judgment and Substitute Assets

39. The United States will seek the imposition of a money judgment against each Defendant upon conviction.

40. Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendants up to the amount of the money judgment against that Defendant.

A TRUE BILL

Original Signature on File
_____
FOREPERSON


RYAN K. PATRICK
UNITED STATES ATTORNEY

ALLAN MEDINA
ACTING CHIEF, HEALTH CARE FRAUD UNIT
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

_____
DEVON HELFMEYER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE